# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

MICHAEL STEPHEN GULLAS,        )     CASE NO.  1:18CV00719
                                         )
        Plaintiff,            )     JUDGE DONALD C. NUGENT
                                         )
        v.                )     MAGISTRATE JUDGE
                                       )     JONATHAN D. GREENBERG
NANCY A. BERRYHILL,          )
        Acting Commissioner    )
        of Social Security,      )
                                       )     **REPORT AND**
        Defendant.        )     **RECOMMENDATION**

Plaintiff, Michael Stephen Gullas, ("Plaintiff" or "Gullas"), challenges the final decision of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before[2] the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional appropriations funding the federal government. *See* General Order 2018-15. The stay was thereafter extended pursuant to General Order 2019-1. As the government shutdown has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

# I.  PROCEDURAL HISTORY

In March 2015, Gullas filed an application for POD, DIB, and SSI, alleging a disability

onset date of November 9, 1964 and claiming he was disabled due to depression, anxiety, erratic

thinking, a learning disability, attention deficit hyperactivity disorder, and obsessive-compulsive

disorder.  (Transcript ("Tr.") 248, 255, 285.)  The applications were denied initially and upon

reconsideration, and Gullas requested a hearing before an administrative law judge ("ALJ").  (Tr.

172, 175, 182, 189, 194.)

On January 31, 2017, an ALJ held a hearing, during which Gullas, represented by

counsel, and an impartial vocational expert ("VE") testified.  (Tr. 70.)  On May 2, 2017, the ALJ

issued a written decision finding Gullas was not disabled prior to March 17, 2015, but was

disabled as of March 17, 2015.  (Tr. 8-36.)  Because Gullas' date last insured for Title II benefits

was December 31, 2014, this resulted in an award of SSI benefits only, not POD or DIB.  (*Id*.)

The ALJ's decision became final on February 1, 2018, when the Appeals Council declined

further review.  (Tr. 1.)

On March 29, 2018, Gullas filed his Complaint to challenge the Commissioner's final

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14, 15.)

Gullas asserts the following assignments of error:

(1)  The Commissioner's finding that Mr. Gullas' onset of disability was
March 17, 2015 is not based on substantial evidence and also violates
Social Security Ruling 83-20.  The Commissioner erred in failing to obtain
the advice of a medical expert as to onset.

(2)  The Commissioner's residual functional capacity assessment for the period
prior to March 17, 2015 is not based on substantial evidence.

(3)  The Appeals Council erred in finding that Mr. Gullas did not have good
cause for submitting the neurocognitive assessment of Joseph Steiner,

2

Ph.D.

(Doc. No. 12.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Gullas was born in November 1962 and was 54 years-old at the time of his administrative hearing, making him a "person closely approaching advanced age" under social security regulations.  (Tr. 112.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  He has a limited education and is able to communicate in English.  (Tr. 28.)  He has past relevant work as a janitor and oil extractor.  (Tr. 27.)

### B.    Medical Evidence[3]

### 1.    Evidence prior to Date Last Insured of December 31, 2014

In 1969, at age 6, Gullas was evaluated for special education services with the Warren Woods Public School District in Michigan.  (Tr. 365.)  Gullas was an "extremely immature youngster with a lot of emotional problems," who was "functioning on about a 4-year-old level socially."  (*Id.*)  His weaknesses were reading and arithmetic, though his ability level was thought to be greater than his actual achievement.  (*Id.*)  He required "close supervision and academic tutoring."  (*Id.*)

In 1970, at age 7, Gullas was re-evaluated by his school district.  (Tr. 361.)  He was

---

[3]    The Court notes its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. The Court further notes both Gullas and the Commissioner have cited generally to large swaths of evidence in their Briefs.  (*See* Doc. No. 12 at 8, 10, Doc. No. 14 at 5, Doc. No. 15 at 5.)  This does not comply with the Court's Order, which specifically provides the brief "shall cite, by exact and specific transcript page number, the pages relating" to the facts at issue.  (Doc. No. 4 at 3.)

reading at the second grade level and had good sight vocabulary.  (*Id.*)  His weakness was comprehension.  (*Id.*)  His teachers integrated him into the regular second grade classroom and he made a "successful adjustment but still require[d] some guidance in behavior management and academic skills."  (*Id.*)  He also had improved "socially and emotionally" since his prior evaluation.  (*Id.*)

Gullas' fourth grade report cards indicated he was reading at the fourth grade remedial level.  He was making satisfactory progress in some areas and needed to improve in others.  (Tr. 355, 357, 358.)  In the fifth grade, Gullas underwent academic testing, achieving scores in the second to the fortieth percentile.  (Tr. 359.)  He scored the lowest in study skills and the highest in language.  (*Id.*)  Generally, Gullas was working at the second to third grade level.  (*Id.*)  Peabody individual achievement tests also confirmed Gullas was performing at the second to third grade level.  (Tr. 362, 363.)

Gullas underwent additional academic testing in 1974, 1976, and 1977.  (Tr. 375, 378, 379.)  The majority of his scores fell in the below average range.  (*Id.*)  His report cards from grade seven and eight revealed grades in the C and D range.  (Tr. 376.)

In 1977, Gullas was referred to a school psychologist due to "increased academic and social problems."  (Tr. 368.)  In October 1977, when Gullas was in the ninth grade, he underwent a psychological evaluation.  (Tr. 370.)  The evaluating psychologist, G. Bauer, noted Gullas gave up easily, failed to turn in work, and struggled to sustain attention in school.  (*Id.*)  Gullas' father reported Gullas' early development was within normal limits, but there had been some stressors in the home in recent years.  (*Id.*)  Gullas' father relayed Gullas enjoyed working on car engines and was currently saving up for a motorcycle with an after school landscaping job.  (Tr. 371.)

4

Intelligence testing conducted during the evaluation revealed Gullas' overall ability fell within the "slow learning range."  (*Id*.)  His non-verbal abilities were in the average range and he had strong psychomotor and visual skills.  (*Id*.)  He had a "distinctive deficiency" in spacial abilities.  (*Id*.)  However, the examiner concluded Gullas' measured abilities were "a very conservative estimate."  (*Id*.)  Academic testing revealed Gullas read at the 8.5 grade level, spelled at the 5.2 grade level, and had "not mastered the basic number facts" in mathematics. (*Id*.)  The examiner recommended continued social work services through the school.  (*Id*.)

On October 22, 2014, Gullas initially saw primary care physician Katherine Ayers M.D. (Tr. 528.)  He reported frequent urination and visual problems in the right eye.  (*Id*.)  He explained he was scheduled to undergo work up for multiple sclerosis and sleep apnea, but had lost his insurance.  (*Id*.)  Gullas reported losing his job 8 years prior and a recent divorce, which he found stressful.  (Tr. 529.)  Dr. Ayers observed Gullas was applying "for disability for psychiatric reasons, but he ha[d] never seen a psychiatrist."  (*Id*.)

On examination, Gullas was malodorous and morbidly obese.  (Tr. 530.)  He was wheezing, with bilateral pitting edema on his ankles.  (*Id*.)  He had a normal gait, a normal neurological examination, was oriented to person, place, and time, and was depressed.  (*Id*.)  Dr. Ayers referred Gullas to a urologist and ophthalmologist.  (Tr. 531.)  She ordered a sleep study and labwork as well.  (*Id*.)

Gullas underwent a sleep study on November 22, 2014.  (Tr. 550.)  During the sleep study, Gullas refused to undergo a portion of the study because "he would not use the PAP therapy at home."  (*Id*.)  The sleep study confirmed obstructive sleep apnea.  (Tr. 551.)

Gullas returned to Dr. Ayers on November 24, 2014.  (Tr. 522.)  Gullas refused to see a

dietician regarding weight loss, relaying he knew how to lose weight.  (*Id*.)  He also did not want to start hypertension medication because he wanted to alter his diet first.  (*Id*.)  Gullas requested a referral to a psychiatrist for his depression, which Dr. Ayers provided.  (Tr 522, 524.)  On examination, Gullas had a normal gait, normal neurological examination, and normal mood and affect.  (Tr. 524.)

### 2. Evidence following Date Last Insured of December 31, 2014

On January 26, 2015, Gullas visited Dr. Ayers, reporting he had seen a psychiatrist for his depression.  (Tr. 518.)  He requested a referral to a neuro-psychologist for evaluation of attention-deficit disorder and a referral to a neurologist to discuss multiple sclerosis.  (*Id*.)  On examination, Gullas had a normal gait and normal neurological examination.  (Tr. 520.)  Dr. Ayers categorized Gullas' mood and affect as "indifferent."  (*Id*.)  She provided referrals to a neuro-psychologist and neurologist and recommended Gullas begin hypertension medications. (*Id.*)

On February 18, 2015, Gullas had a multiple sclerosis consultation with neurologist John Andrefsky, M.D.  (Tr. 560.)  He reported he had lost vision in his right eye for two months in 2008.  (*Id*.)  Gullas relayed his right eye vision had returned, but the vision in his left eye was better.  (*Id*.)  He denied any issues with walking, weakness, or numbness in his extremities.  (*Id.*) Gullas described episodes of confusion over the past several years.  (*Id*.)

On examination, Gullas' recent and remote memory were intact and his concentration and attention were normal.  (Tr. 562.)  He displayed adequate knowledge of current events and his opthalmoscopic, motor, and sensory examinations were all normal.  (Tr. 563.)  Gullas also has normal coordination and gait.  (*Id*.)  Dr. Andrefsky ordered  brain and cervical spine MRIs, an

EEG, and labwork.  (Tr. 563, 564.)  The doctor also observed Gullas had a "normal neurological examination" and recommended weight loss.  (Tr. 564.)

On February 20, 2015, Gullas underwent a mental health diagnostic assessment at Signature Health with therapist Cathleen McLaughlin.  (Tr. 444.)  Gullas reported he recently divorced and others had been advising him to seek help.  (*Id*.)  He described poor sleep, anger, poor comprehension, hyperactivity, and difficulty in school.  (Tr. 444, 454.)  Ms. McLaughlin diagnosed adjustment disorder with anxiety/depression and assessed a Global Assessment of Functioning[4] ("GAF") score of 60.  (Tr. 445, 446.)

Gullas returned to Signature Health on March 11, 2015 for a psychiatric evaluation with psychiatrist Luis Ramirez, M.D.  (Tr. 382.)  Gullas denied a history of mental health treatment, secondary to a lack of insurance.  (*Id*.)  He described a long history of psychosocial difficulties, including poor learning, relationships, and vocational history.  (*Id*.)  On examination, Gullas was poorly dressed and groomed and his judgment and insight were limited.  (*Id*.)  Gullas reported depression, poor concentration and attention, and some obsessive-compulsive symptoms.  (*Id*.)  Dr. Ramirez diagnosed ADHD, sleep apnea, and a mood disorder.  (*Id*.)  He strongly advised Gullas to receive treatment for his sleep apnea and prescribed Strattera and Abilify.  (*Id*.)

On March 16, 2015, Gullas visited Dr. Ayers, reporting he stopped most of his

_____

[4]     The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

medications.  (Tr. 513.)  Gullas' blood pressure was very high and Dr. Ayers noted he was

having difficulty making any lifestyle changes.  (*Id*.)  Gullas described a recent episode of chest

pain and right ear deafness.  (*Id*.)  On examination, Gullas had a normal gait, mood, and affect.

(Tr. 516.)  Dr. Ayers ordered an EKG for the chest pain, which was normal.  (Tr. 516, 517.)  Dr.

Ayers referred Gullas to an ENT for his right ear hearing loss and strongly encouraged him to

take his blood pressure medications.  (Tr. 516.)

That same date, Gullas visited Dr. Andrefsky for follow up.  (Tr. 555.)  Gullas had not

obtained the prescribed MRIs or EEG.  (*Id*.)  Dr. Andrefsky noted an MRI from 2010 revealed

several white matter lesions on the brain.  (*Id*.)  Gullas' B12 and folate levels were within normal

limits.  (*Id*.)  On examination, Gullas' recent and remote memory were intact.  He had no tremor

and a normal gait and station.  (Tr. 557, 558.)  His muscle tone and motor exam were both

normal.  (Tr. 558.)  Dr. Andrefsky concluded Gullas was "stable from a neurological standpoint"

and encouraged Gullas to obtain the MRIs and an EEG, as well as lose weight and treat his sleep

apnea.  (Tr. 559.)  Dr. Andrefsky diagnosed restless leg syndrome and prescribed Gabapentin.

(Tr. 558.)

On March 25, 2015, Gullas visited Dr. Ramirez at Signature Health, reporting side effects

from his Strattera and Abilify.  (Tr. 386, 389.)  He described poor sleep, mood changes, and

anxiety, but denied any suicidal ideation or psychosis.  (Tr. 389.)  Dr. Ramirez prescribed

Latuda.  (*Id.*)

An April 7, 2015 MRI of the cervical spine revealed a disc herniation at C5-6, but no

stenosis.  (Tr. 577.)

Dr. Ayers filled out a form prepared by the Social Security Administration on April 24,

8

2015.  (Tr. 510-511.)  Within this form, Dr. Ayers noted Gullas "states his health began to decline in 2007 when he lost his job."  (Tr. 510.)  She relayed while "specific dates for each condition are not known," Gullas had been stable since October 2014.  (*Id*.)  She noted Gullas was non-compliant with her diet, exercise, and weight loss recommendations.  (Tr. 511.)  Dr. Ayers provided the following opinion on Gullas:

> Mr. Gullas' depression and negativity would make it very difficult for him to interact with coworkers and the public.  He is physically limited by his morbid obesity, however suspect his physical limitations are exacerbated by depression.  Formal functional capacity testing through PT/OT is recommended.

(*Id*.)

On May 7, 2015, Gullas visited Dr. Ramirez, reporting he was doing better on his medications, but continued to have issues with concentration and attention.  (Tr. 403.)  His mood was stable and he denied any anger problems.  (*Id*.)  Dr. Ramirez continued Gullas' Latuda and prescribed Wellbutrin.  (Tr. 404.)

Gullas returned to Dr. Ayers on May 18, 2015, requesting a "narcotic" to sleep at night and assist him in losing weight.  (Tr. 611.)  Dr. Ayers advised him medications would not effectively treat his sleep apnea and observed Gullas had no specific weight loss plan.  (*Id*.)  On examination, Gullas' gait was normal.  (Tr. 614.)  His blood pressure remained high.  (*Id*.)  Dr. Ayers prescribed Temazepam for sleep.  (*Id*.)  Gullas saw Dr. Ayers again on May 27, 2015, with complaints of poor sleep and a request for weight loss medication.  (Tr. 607.)  Dr. Ayers advised Gullas she would not prescribe a sleep aid and weight loss medication concurrently.  (*Id*.)  She recommended he keep a food diary and observed Gullas needed to "take active steps on his own in order to improve his situation."  (Tr. 610.)  She prescribed Ambian for sleep.  (*Id*.)

On June 22, 2015, Gullas visited Dr. Ayers with a food diary confirming a poor diet.  (Tr.

9

603.)  Despite this, Gullas declined a referral to a dietician.  (*Id*.)  Dr. Ayers found Gullas to be "insistent, somewhat demanding" and "in denial with regards to his poor eating habits."  (Tr. 606.)  She prescribed Belviq for weight loss.  (*Id*.)

Gullas returned to Dr. Ayers on September 8, 2015, reporting difficulty breathing with any type of exertion, including eating.  (Tr. 599.)  Dr. Ayers found Gullas to be "fixated on his sleep disorder," which Gullas reported "was not treatable."  (*Id*.)  Gullas indicated he was not capable of losing weight without medication.  (*Id*.)  On examination, Gullas had normal breath sounds, a normal gait, no edema, and a dysphoric and futile mood.  (Tr. 602.)  Dr. Ayers ordered pulmonary function testing.  (*Id*.)

Dr. Ramirez filled out a form regarding Gullas on January 28, 2016.  (Tr. 634.)  He opined Gullas had some limitations in his abilities to (1) remember locations and work-like procedures; (2) understand/remember short and simple instructions; (3) sustain an ordinary routine without special supervision; (4) make simple work-related decisions; (5) maintain socially appropriate behavior; (6) ask simple questions or request assistance; (7) accept instruction; and (8) respond appropriately to criticism from supervisors.  (*Id*.)  Dr. Ramirez found Gullas had significant limitations in his abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention/concentration for periods of time; (3) complete a work day without interruptions from symptoms; (4) perform at a consistent pace without an unreasonable amount of breaks; (5) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; (6) respond appropriately to changes in the work setting; (7) set realistic goals or make plans independently of others; and (8) require additional supervision to carry out detailed work assignments.  (*Id*.)

On February 12, 2016, the Ohio Department of Opportunities for Ohioans with Disabilities determined Gullas was eligible for vocational rehabilitation services.  (Tr. 633.)  He was found to be "most significantly disabled," with limitations in self-direction for employment outcome, interpersonal skills, and work tolerance.  (*Id.*)

From October 23 – 27, 2016 Gullas was psychiatrically hospitalized after a suicide attempt.  (Tr. 656, 688.)  He described suicidal ideation and admitted he had discontinued his psychotropic medications on October 1, 2016 because he did not think they were helpful.  (Tr. 656.)

Gullas followed up with Dr. Ramirez on November 23, 2016, reporting medication compliance.  (Tr. 1059.)  Dr. Ramirez observed Gullas had not "collaborated with other therapeutic plans offered to him."  (Tr. 1059.)  During the session, Gullas was tearful, explaining he was unable to live alone.  (*Id.*)  He described depression but denied suicidal ideation.  (*Id.*)  Dr. Ramirez observed Gullas was displaying a "very dependant attitude."  (*Id.*)  Gullas returned to Dr. Ramirez on December 5, 2016, reporting his medications were helpful.  (Tr. 1069.)  However, he was pessimistic about the future and "negative about improving and even participating in treatment."  (*Id.*)

On January 11, 2017, Gullas reported increased stress over his financial difficulties and upcoming disability hearing.  (Tr. 1095.)  Gullas indicating he had "never worked" and was not able "to function around other people."  (*Id.*)  While Gullas denied suicidal ideation, Dr. Ramirez was "concerned about the future if he does not get the disability decision."  (*Id.*)

C.      **State Agency Reports**

1.          **Mental Impairments**

On August 13, 2015, Gullas underwent a consultative examination with psychologist Alison Flowers, Psy.D. (Tr. 586.) He reported he could not "take care of [himself his] whole life." (*Id.*) He indicated he lived alone and depended upon his friends to pay his rent. (Tr. 587.) Gullas relayed he dropped out of school in the ninth grade and was in special education for the entirety of his academic career. (*Id.*) He reported difficulty obtaining a job due to his lack of education and indicated he had "never been able to hold a job for more than a couple of months at a time due to his concentration problems." (Tr. 588.) Gullas described depression, poor sleep, poor concentration, excessive worry, and irritability. (Tr. 589.)

On examination, Gullas' expressive and receptive language skills were adequate, but his thought process was tangential. (Tr. 590.) His attention and concentration were mildly impaired and he was able to complete simple calculations. (Tr. 590-591.) His recent and remote memory skills were mildly impaired. (Tr. 591.) Dr. Flowers estimated Gullas' intellectual functioning was in the borderline range. (*Id.*)

Based upon this examination, Dr. Flowers diagnosed attention deficit hyperactivity disorder ("ADHD"), depressive disorder, anxiety disorder, and borderline intellectual functioning. (Tr. 591.) She provided the following discussion on Gullas' work-related mental abilities:

1. **Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**

   The claimant reported that he has difficulty carrying out instructions due to concentration problems. He did appear to have concentration difficulties during this appointment. Questions, at times, needed to be repeated. He also had difficulty remembering objects after delay.

2. **Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform**

12

**simple tasks and to perform multi-step tasks.**

The claimant appeared to have difficulty sustaining attention and concentration during this appointment.  He was tangential.  However, he did appear capable of performing simple tasks.  For example, he could perform simple calculations and his digit span was adequate.  He may have more difficulty on multi-step tasks.  For example, he declined to complete serial 3s.  He reported that he has difficulty driving due to his concentration problems.  He has only worked jobs in the past that require him to do simple tasks.

**3.     Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

The claimant has only held short term jobs, although did not report any problems related to getting along with others while working.  He did report a history of irritability, that he reports has improved.  He interacted appropriately throughout the appointment.

**4.     Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

The claimant reported problems related to anxiety, depressed mood, and irritability.  Although he reported that he did not want to bring his medications here due to contamination fears, other symptoms consistent with anxiety were not observed during this appointment.  Likewise, no problems related to depressed mood or irritability were observed.  The claimant appeared to be euthymic during this appointment.  He is receiving medication management.

(Tr. 592-593.)

On August 24, 2015, state agency physician Kristen Haskins, Psy.D. determined there was insufficient evidence to make a determination as to disability from Gullas' alleged onset date of disability (November 6, 1964) to his date last insured for Title II benefits (December 31, 2014).  (Tr. 118.)

With respect to Gullas' Title XVI claim, Dr. Haskins completed a Psychiatric Review Technique ("PRT").  (Tr. 117-118.)  Dr. Haskins concluded Gullas had (1) moderate restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3)

13

moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of

decompensation. (Tr. 118.) Dr. Haskins also filled out a Mental Residual Functional Capacity

("RFC") Assessment for Gullas' Title XVI claim, in which she concluded Gullas was moderately

limited in his abilities to (1) understand, remember, and carry out detailed instructions; (2)

maintain attention and concentration for extended periods; (3) work in coordination with or in

proximity to others without being distracted by them; (4) make simple work-related decision; (5)

complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; (6) interact appropriately with the general public; (7) accept instructions and respond

appropriately to criticism from supervisors; (8) get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; and (9) respond appropriately to changes in

the work setting. (Tr. 120-122.) Dr. Haskins also found Gullas was not significantly limited in

his abilities to maintain socially appropriate behavior and to adhere to basic standards of neatness

and cleanliness. (Tr. 122.) Dr. Haskins found no evidence of any limitation in Gullas' abilities

to (1) remember locations and work-like procedures; (2) understand, remember, and carry out

very short and simple instructions; (3) perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without

special supervision; (5) ask simple questions or request assistance; (6) be aware or normal

hazards and take appropriate precautions; (7) travel in unfamiliar places or use public

transportation; and (8) set realistic goals or make plans independently of others. (Tr. 121-122.)

      Dr. Haskins explained the basis of her decision as follows:

> Claimant has the ability to understand and complete simple and some not
> more than moderately complex tasks. Limitations due to some problems

14

with concentration and memory.

\*\*\*

Claimant has the ability to attend, concentrate and persist in setting with short cycle tasks and at most moderate pace demand where can work away from others.

\*\*\*

Claimant has the ability to interact appropriately with others in the workplace that has expectation fro[sic] occasional superficial interactions

\*\*\*

Claimant has the ability to adapt to routine changes in the workplace that has at most moderate time and production demands.

(Tr. 121-122.)

On November 19, 2015, state agency physician Tonnie Hoyle, Psy.D., filled out a PRT and Mental RFC. (Tr. 149-150, 152-154.) Similar to Dr. Haskins, Dr. Hoyle also found insufficient evidence prior to the date last insured for Title II purposes. (Tr. 154.) With respect to Gullas's Title XVI claim, Dr. Hoyle adopted the findings of Dr. Haskins. (Tr. 149-150, 153-154.)

### 2. Physical Impairments

On May 28, 2015, state agency physician Stephen Sutherland, M.D., reviewed Gullas' medical records and completed a Physical RFC Assessment. (Tr. 119-120.) With respect to Gullas' Title II claim, Dr. Sutherland concluded there was insufficient evidence prior to Gullas' date last insured. (Tr. 120.) For Gullas' Title XVI claim for benefits, Dr. Sutherland determined Gullas could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit for about 6 hours in an

15

eight-hour workday.  (*Id.*)

On November 16, 2015, state agency physician Maureen Gallagher, D.O., reviewed

Gullas' medical records and completed a Physical RFC Assessment.  (Tr. 151-152.)  She adopted

the findings of Dr. Sutherland.  (*Id.*)

**D.**     **Hearing Testimony**

During the January 2017 hearing, Gullas testified to the following:

- He has his driver's license.  (Tr. 74.)  He seldom drives.  (*Id.*)  He has a ninth grade education, but "had problems all the way through school."  (Tr. 75.)  He was in special education.  (*Id.*)

- He is able to read, but "not so well."  (Tr. 75.)  He took a GED course, but his instructor told him he "would never be able to pass the GED test."  (*Id.*)

- He last worked in 2008 and 2009 as a janitor.  (Tr. 76.)  He has worked many jobs in the past, but they would only last "about a year or less."  (Tr. 77-78.)  The majority of his jobs were "cleaning and picking up garbage."  (Tr. 78.)

- He does not get along with others.  (Tr. 79.)  He has gotten into arguments with coworkers.  (*Id.*)  He rarely leaves the house and his friends and ex-wife help him pay his rent.  (Tr. 81-82.)

- He has been unable to obtain health care for the majority of his adulthood, due to lack of insurance.  (Tr. 82.)  He obtained health insurance in April 2014 and began to see a psychiatrist and therapist.  (Tr. 83.)

- He is always depressed and worried.  (Tr. 84.)  He has attempted suicide.  (Tr. 88.)  He does not know how to cook or do laundry.  (Tr. 85.)  He can prepare simple meals, such as sandwiches or noodles.  (*Id.*)

- He has lower back pain "a little bit, but not – not really."  (Tr. 86.)  He went blind in his right eye four years ago, but his vision returned.  (Tr. 86-87.)  His right eye vision is still blurry, even with glasses.  (Tr. 87.)

- He has "untreatable sleep apnea."  (Tr. 87.)  CPAP machines were not effective.  (*Id.*)  He is in bed from 6:00 p.m. to 11:00 a.m. each day, but does not sleep for much of this time.  (Tr. 87-88.)   He does not dress or shower daily.  (Tr. 89.)

- He has poor memory and "erratic thinking."  (Tr. 90.)  He has made poor

decisions his entire life.  (Tr. 92.)  He has difficulty using public transportation.
(Tr. 97.)

The VE testified Gullas had past work as a janitor (D.O.T. #381.687-018) and an oil

extractor (D.O.T. #609.684-014).  (Tr. 99.)  The ALJ then posed the following hypothetical

question:

> Please assume a hypothetical individual of the claimant's age, education, and
> work experience who is able to perform medium exertional work limitations.
> The individual should never be exposed to unprotected heights, dangerous
> moving mechanical parts, or operate a motor vehicle.  The individual would
> have difficulty reading normal print but retain sufficient visual acuity to read
> large print, work with large objects, and avoid workplace hazards.  The
> individual can understand, remember, and carry out simple, routine tasks,
> and the individual can frequently interact with supervisors, coworkers, and
> the public.

(Tr. 100.)

The VE testified the hypothetical individual would be able to perform Gullas' past work

as a janitor and oil extractor.  (*Id.*)  The VE further explained the hypothetical individual would

also be able to perform other representative jobs in the economy, such as laundry worker (D.O.T.

#361.684-014), sweeper-cleaner, industrial (D.O.T. #389.683-010); and marker (D.O.T.

#369.687-026).  (Tr. 101.)

The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual of the individual's age, education,
> and work experience who is able to perform light exertional work
> activities, as defined in the regulations, with the following specific
> exertional limitations: The individual should never be exposed to
> unprotected heights, dangerous moving mechanical parts, or operate a
> motor vehicle.  The individual would have difficulty reading normal print
> but retain sufficient visual acuity to read large print, work with large
> objects, and avoid workplace hazards. The individual can understand,
> remember, and carry out simple, routine tasks; can frequently interact with
> supervisors; and occasionally interaction with coworkers and the public.

17

(Tr. 102.)  The ALJ then added following limitations to this hypothetical: (1) the individual can frequently climb ramps and stairs; no crouch, crawl; but should never climb ladders, ropes, and scaffolds; (2) the individual can tolerate occasional changes in a routine work setting; however, these changes should be well explained and introduced slowly; (3) the individual can superficially interact with coworkers and the public – meaning the individual has the ability to "greet, refer co-workers or public to other coworkers regarding the demands and requests, answer questions about time of day, give directions to the bathroom.  Superficial interaction would not involve claimant dealing directly with demand or problems of the coworker or customer;" (4) the individual would have to work alone, away from others; and (5) the individual would be off-task more than 10 percent.  (Tr. 102-106.)  The VE testified with all these limitations, there would be no available jobs.  (Tr. 106.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a

claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Gullas was first insured on April 1, 1983 (over twenty years after his alleged onset date), and remained insured through December 31, 2014, his date last insured ("DLI.")  (Tr. 112.)

Therefore, in order to be entitled to POD and DIB, Gullas must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.  The claimant engaged in substantial gainful activity during the following periods: 2004, 2005, 2006, 2007, and 2009 (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3.  However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity. Beginning on March 17, 2015, the claimant has not engaged in substantial gainful activity (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

4.  Since the alleged onset date of disability, November 9, 1964, the claimant has had the following severe impairments: vision changes; optic neuritis; morbid obesity with a 44 BMI; major depressive disorder; and obstructive sleep apnea. Beginning on the established onset date of disability, March 17, 2015, the claimant has had the following severe impairments: vision changes; optic neuritis; abnormal white matter lesions; adjustment disorder with anxiety and depression; C5-6 disc herniation; morbid obesity with a 44 BMI; major depressive disorder; anxiety disorder; borderline intellectual functioning; ADHD; mood disorder; and obstructive sleep apnea (20 CFR 404.1520(c) and 416.920(c)).

5.  Since the alleged onset date of disability, November 9, 1964, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.  After careful consideration of the entire record, the undersigned finds that prior to March 17, 2015, the claimant had the residual functional capacity to

20

perform medium work as defined in 20 CFR 404.1567(c) except that the claimant could never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle. The claimant had difficulty reading normal print but retained sufficient visual acuity to read large print, work with large objects, and avoid workplace hazards. The claimant was able to understand, remember, and carry out simple, routine tasks. The claimant could frequently interact with supervisors, coworkers, and the public.

7.    The undersigned finds that beginning on March 17, 2015, the claimant's mental condition worsened.

8.    After careful consideration of the entire record, the undersigned finds that beginning on March 17, 2015, the claimant has the residual functional capacity to perform light word as defined in 20 CFR 416.967(b) except the claimant can frequently climb ramps and stairs, kneel, crouch, and crawl but should never climb ladders, ropes, and scaffolds. The claimant should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle. The claimant would have difficulty reading normal print but retains sufficient visual acuity to read large print, work with large objects, and avoid workplace hazards. The claimant can understand, remember, and carry out simple, routine tasks. The claimant can occasionally tolerate changes in a routine work setting; however, those changes should be well explained and introduced slowly. The claimant can frequently interact with supervisors. The claimant can superficially interact with coworkers and the public. And by superficially, the undersigned means the ability to greet people, refer the coworkers or public to other co-workers regarding coworkers regarding coworkers or customers' demands or requests, answer questions about time of day, and give directions to the bathroom. Superficial interaction would not involve claimant dealing directly with demands or problems of the coworker or customer. The claimant should work alone. The claimant would be off task more than 10 percent of the time on a consistent basis.

9.    Prior to March 17, 2015, the claimant capable of performing past relevant work as a(n): Janitor (DOT #381.687-018), unskilled, medium work, SVP 2; and Oil Extractor (DOT #609.684-014), unskilled, heavy work actually performed at the light level, SVP 2. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity.

10.    Beginning on March 17, 2015, the claimant's residual functional capacity has prevented the claimant from being able to perform past relevant work (20 CFR 416.965).

21

11.     The claimant was an individual closely approaching advanced age on March 17, 2015, the established disability onset date (20 CFR 416.963).

12.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

13.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

14.     Beginning on March 17, 2015, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966.

15.     The claimant was not disabled prior to March 17, 2015, (20 CFR 404.1520(f) but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 416.920(g)).

(Tr. 14-31.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v.*

23

*Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If

relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.

Ohio July 9, 2010).

## VI.  ANALYSIS

### A.      Determination of Onset Date

In his first assignment of error, Gullas asserts the ALJ's determination he became

disabled on March 17, 2015 was not supported by substantial evidence and violated Social

Security Ruling 83-20.  (Doc. No. 12 at 1.)  Gullas argues this "error was particularly critical in

this case because [his] insured status [for Title II benefits] expired only two and a half months

earlier on December 31, 2014.  (*Id.* at 13.)  Gullas contends the ALJ's selection of March 17,

2015 as the onset date of disability "was arbitrary" and "inconsistent with evidence of record

prior to that date."  (*Id*.)  He maintains the ALJ "should have obtained medical expert testimony

as to onset of disability."  (*Id*.)

The Commissioner asserts the ALJ properly determined Gullas was disabled as of

March 17, 2015.  (Doc. No. 14 at 7.)  The Commissioner contends Gullas "failed to put forth

evidence showing he was disabled prior to his date last insured" for Title II benefits.  (*Id*.)  The

Commissioner maintains Gullas "did not have any significant treatment history for his underlying

conditions prior to December 31, 2014," his DLI.  (*Id*. at 8.)  The Commissioner further notes

"there is a 38-year gap between 1977 and the end of 2014 where [Gullas] never received any

treatment for any underlying mental health condition."  (*Id*. at 9.)  The Commissioner asserts

Gullas' argument "reflects a misunderstanding of the governing rules for determining the onset

date."  (*Id*.)

The Social Security Administration oversees various disability programs, which fall

under Title II and Title XVI of the Social Security Act.  Title II of the Social Security Act

provides disability insurance benefits ("DIB") for workers who have become disabled.  42 U.S.C.

§ 423.  Title XVI of the Social Security Act, in turn, establishes the Supplemental Security

Income ("SSI") benefit program.  This program provides cash grants to low-income individuals

who are aged, blind, or disabled.  42 U.S.C. § 1381-1383.

These two programs each have their own eligibility requirements and standards.

Relevant to here, Title II provides for some retroactive benefits from the date of the application

whereas Title XVI does not.  SSR 83-20,[5] 1983 WL 31249, *1 (1983).  Moreover, in order to

qualify for DIB benefits, a claimant must have insured status and provide evidence of disability

prior to the expiration of such status, i.e. by the claimant's date last insured ("DLI").  20 C.F.R.

§§ 404.130 and 404.315.  SSI claims have no such requirement.

Social Security regulations place the burden on a claimant to prove the existence of a

---

[5]    Social Security Ruling 83-20 governs the determination of disability onset date.
However, SSR 83-20 was rescinded and replaced on October 2, 2018 with Social
Security Rulings 18-1p and 18-2p.  SSR 18-01p, 2018 WL 4945639, *1 (S.S.A.
Oct. 2, 2018); SSR 18-02P, 2018 WL 4945640, *1 (S.S.A. Oct. 2, 2018).
However, the Social Security Administration has indicated "Federal Courts will
review our final decisions using the rules that were in effect at the time we issued
the decisions."  SSR 18-01p, 2018 WL 4945639 at *7.  The ALJ issued Gullas'
disability decision on May 2, 2017 and the Appeals Council affirmed this
decision on February 1, 2018.  (Tr. 1, 31.)  Thus, SSR 83-20 was still in effect at
the time of the final decision of the Commissioner.

disability.  *Foster v. Haller*, 279 F.3d 348, 353 (6th Cir. 2001).  However, "[o]nce a finding of disability is made, the ALJ must determine the date of onset."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.  2006).  Social Security Ruling 83-20 governs the determination of disability onset date.[6]  *See* SSR 83-20, 1983 WL 31249 (1983).  Of particular relevance herein, SSR 83-20 provides as follows:

Precise Evidence Not Available--Need for Inferences

 In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.  How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.  If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

* * *

The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition).  The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death.  Convincing rationale must be given for the date selected.

* * *

Title XVI – Specific Onset Ordinarily Not Necessary

Onset will be established as of the date of filing provided the individual was

---

[6]     Social Security Rulings do not have the force of law, but are "binding on all components of the Social Security Administration" and represent "precedent final opinions and orders and statements of policy and interpretations" adopted by the Commissioner.  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272, fn 1 (6th Cir. 2010) (citing 20 CFR § 402.35(b)(1)).

> disabled on that date. Therefore, specific medical evidence of the exact onset
> date need not generally be obtained prior to the application date since there is no
> retroactivity of payment because title XVI payments are made beginning with the
> date of application provided that all conditions of eligibility are met.

*Id*. at * 2-3; *7. HALLEX I–2–6–70 (regarding ME testimony) similarly provides that "[a]n ALJ

is encouraged to consult with an ME when he or she must make an inference about the onset of

disability." *See* HALLEX I–2–6–70 at Note 3 (citing SSR 83–20).

Here, the ALJ acknowledged Gullas had to establish disability "on or before" December

31, 2014 "in order to be entitled to a period of disability and disability insurance benefits." (Tr.

12.) The ALJ reviewed the evidence relating to the time period prior to Gullas' DLI, discussing

his testimony, educational records, and the two doctor appointments from 2014. (Tr. 18-19.)

The ALJ determined this evidence did not establish disability prior to Gullas' DLI, explaining as

follows:

> In contrast, the objective medical evidence and other evidence of record
> shows that there is little treatment prior to December 2014 and that it only
> started in October 2014. The State agency consultants found that there was
> insufficient evidence for the Title II claim (1A/6-7, 9, 11; 2A/6-7, 9, 11;
> 7A/7, 9, 11, 13; 8A/7, 9, 11), and the undersigned agrees.

(Tr. 19.) The ALJ concluded because "the claimant's date last insured is December 31, 2014, the

remainder of the analysis in this decision will solely address the Title XVI claim, where

applicable." (Tr. 24.)

The second portion of the ALJ's decision provided a more restrictive RFC, along with a

discussion of Gullas' worsening mental state. (Tr. 24, 26.) The ALJ concluded Gullas was "not

disabled through December 31, 2014, the date last insured", but was disabled from March 17,

2015 (the SSI application date) through the present. (Tr. 31.) Accordingly, the ALJ approved

Gullas' SSI claim at this later date of March 17, 2015.

27

The Court finds substantial evidence supports the ALJ's conclusion Gullas did not establish disability prior to his DLI.  Indeed, the evidence prior to the DLI is minimal.  Gullas submitted educational records from 1969– 1977, which established he required special education services and received poor grades.  (Tr. 355, 365, 361, 376.)  Academic testing indicated he was performing in the below average range.  (Tr. 375, 378, 379.)  A psychological evaluation confirmed Gullas was in the "slow learning range."  (Tr. 371.)  There are no IQ scores contained in these records, nor any specific mental health diagnoses.  Moreover, the ALJ accounted for these learning deficits in the RFC[7] covering this time period.  (Tr. 18.)

Gullas' medical records then contain a 37-year gap in treatment.  The next medical record is dated October 22, 2014 – just over two months prior to the DLI.  This office visit with Dr. Ayers confirms Gullas had no regular medical treatment for years and had not seen a psychiatrist for mental health issues.  (Tr. 528-529.)  Dr. Ayers referred Gullas to several specialists and ordered a sleep study, which confirmed sleep apnea.  (Tr. 531, 551.)  On examination, Gullas had leg edema and wheezing, but a normal gait and normal neurological examination.  (Tr. 530.)  The last treatment record prior to the DLI was a follow up visit to Dr. Ayers on November 24, 2014.  (Tr. 522.)  During this visit, Gullas was resistant to taking

---

[7]    The RFC for the time period prior to the SSI application date was as follows: the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except that the claimant could never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle.  The claimant had difficulty reading normal print but retained sufficient visual acuity to read large print, work with large objects, and avoid workplace hazards.  The claimant was able to understand, remember, and carry out simple, routine tasks.  **The claimant could frequently interact with supervisors, coworkers, and the public**.  (Tr. 18.)(emphasis added)

hypertension medication or obtaining help from a dietician to assist him with weight loss.  (Tr. 522.)  On examination, Gullas' gait, neurological examination, mood, and affect were all normal.  (Tr. 524.)  There is no other medical evidence contained in the record prior to Gullas' DLI.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.").

Gullas argues the 37-year gap in treatment was a result of "significant issues getting medical care for years."  (Doc. No. 12 at 14.)  However, it was Gullas' burden, not the ALJ's, to establish disability prior to the DLI.  Moreover, gaps in treatment may be viewed as evidence a claimant's condition was not severe enough to be disabling.  *See Hamlin v. Comm'r of Soc. Sec.*, 104 F.3d 361(Table) (6th Cir. Dec.17, 1996) ("[i]t is true that no new medical evidence was presented regarding the 1985–86 period, but this does not help the claimant; gaps in a history of medical treatment are likely to suggest that the claimant was not receiving treatment during the gaps and was not disabled then").  *See also Cox v. Sec'y of HHS*, 798 F.2d141(Table)(6th Cir. July 11, 1986) ("[w]here a claimant wholly fails to establish entitlement during the period of his insured status, it is this lack of proof which constitutes the substantial evidence which supports the ALJ's decision").  Therefore, the ALJ's conclusion Gullas did not establish disability prior to his DLI of December 31, 2014 is supported by substantial evidence.  Indeed, this 37-year gap in treatment is evidence his "condition was not severe enough to require medical care, much less severe enough to be disabling."  *Simmons v. Comm'r of Soc. Sec.*, 2011 WL 4344040, *3 (N.D. Ohio Sept. 14, 2011).  The ALJ did not require a medical expert to reach this conclusion, and thus, SSR 83-20 was not violated.  *Id.*

Similarly, substantial evidence supports the ALJ's finding Gullas' condition worsened following the date last insured, warranting a finding of disability on March 17, 2015.  During the first several months of 2015, Gullas finally began to obtain regular medical care.  In February 2015, Gullas began to treat with a neurologist and a mental health clinic.  (Tr. 560, 444.)  His GAF score was initially 60, indicating moderate symptoms, and his medications were helpful. (Tr. 446, 403.)  His neurologist found him stable from a neurological standpoint.  (Tr. 559.) However, by October 2016, Gullas' mental state had deteriorated and he required psychiatric hospitalization for a suicide attempt.  (Tr. 656.)  His psychiatrist noted Gullas was a "chronic suicide risk" and was "concerned about the future if [Gullas] was denied disability."  (Tr. 1069, 1095.)

Gullas argues he did not "wake up on March 17, 2015 and suddenly have borderline intellectual functioning."  (Doc. No. 12 at 15.)  However, this is a mischaracterization of the ALJ's decision.  The ALJ was not finding Gullas suddenly had borderline intellectual functioning on the SSI application date, rather, the ALJ was finding there was insufficient evidence to establish this diagnosis prior to the DLI.  (Tr. 19.)  Moreover, the ALJ considered Gullas' educational records when formulating his RFC for the period prior to the DLI, limiting him to simple, routine tasks and frequent interaction with others.  (Tr. 18-19.)

Notwithstanding the evidence supporting the ALJ's determination Gullas did not establish disability prior to his DLI, Gullas argues the ALJ should have applied SSR 83-20 to establish a disability onset date.  (Doc. No. 12 at 14.)  Specifically, Gullas asserts this SSR required the ALJ to consult a medical expert to determine the exact date of disability.  (*Id*.)  The Court is not persuaded by this argument for several reasons.

First, with respect to Gullas' SSI application, the ALJ awarded disability the earliest possible date Gullas could have received SSI benefits, the March 17, 2015 application date.  (Tr. 31.)  As noted *supra*, unlike DIB, SSI benefits are not payable for the period before the month in which an application is filed, regardless of the date the impairments actually became disabling. 20 C.F.R. §§ 416.330, 416.335.  Because of this, under SSR 83-20, an ALJ is not required to find a specific date of onset for Title XVI cases, except in certain limited circumstances (i.e., when the onset is subsequent to the date of filing or when it is necessary to determine whether the duration requirement is met).  SSR 83-20, 1983 WL 31249, at *7.  Thus, the ALJ was not required to determine the specific date[8] of disability onset for Gullas' Title XVI claim.

Secondly, because substantial medical evidence supports the ALJ's finding Gullas was not disabled prior to the DLI, there was no need for the ALJ to provide any further analysis with respect to onset for purposes of the DIB claim.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir.1997) ("The only necessary inquiry is whether the claimant was disabled prior to the expiration of his insured status.").  Indeed, SSR 83-20 only applies when an ALJ finds a claimant disabled prior his DLI, as "a period of disability can commence only while an applicant is fully insured."  *Velez v. Comm'r,* 2017 WL 661651, *6 (N.D. Ohio Feb. 17, 2017).

---

[8]    Moreover, the Court notes even if the ALJ had found a specific date of onset between the DLI of December 31, 2014 and the application date of March 17, 2015, it would have not changed the outcome.  For example, if the ALJ determined Gullas had established disability on February 18, 2015, the date he visited neurologist Dr. Andrefsky, Gullas still would only receive Title XVI payments from the March 17, 2015 application date.  *See Kobetic v. Comm'r*, 144 F. App'x 171, 173 (6th Cir. 2004) (citing *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S. Ct. 1426, 22 L. Ed. 2d 704 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game").

Accordingly, the Court finds substantial evidence supports the ALJ's decision to chose the Title XVI application date as the disability onset date.  Gullas' first assignment of error, therefore, is without merit and does not provide a basis for remand.

**B.       RFC prior to March 17, 2015**

In his second assignment of error, Gullas argues the RFC for the period prior to March 17, 2015 was not supported by substantial evidence.  (Doc. No. 12 at 19.)  Specifically, Gullas asserts the "mental residual functional capacity assessment for this period of time prior to March 17, 2015 is not based on substantial evidence."  (*Id*. at 19-20.)  He contends the "record did not support the ALJ's selection of March 17, 2015 as the onset date of Mr. Gullas' borderline intellectual functioning and anxiety and the record also did not support the limitations in effect on March 17, 2015 only began on that date."  (*Id*. at 20.)

The Commissioner maintains the RFC is supported by substantial evidence.  (Doc. No. 14 at 11-12.)  The Commissioner argues "Gullas failed to provide any evidence showing that he had a medically determinable mental impairment that would produce greater limitations prior to December 31, 2014."  (*Id*. at 11.)  The Commissioner asserts the ALJ "did not overlook the evidence," as she accounted for Gullas' educational difficulties.  (*Id*.)  The Commissioner contends Gullas "has not explained why his educational records undermine the ALJ's finding" and Gullas' "argument is nothing more than a request for this Court to reweigh the evidence."  (*Id*. at 11-12.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An

32

ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3).[9]  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ determined Gullas suffered from the severe impairments of vision changes, optic neuritis, morbid obesity, major depressive disorder, and obstructive sleep apnea since the alleged onset date of disability.  (Tr. 15.)  The ALJ then found from March 17,

---

[9]    Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

2015, Gullas suffered from the severe impairments of vision changes, optic neuritis, abnormal white matter lesions, adjustment disorder with anxiety and depression, a C5-6 disc herniation, morbid obesity, major depressive disorder, anxiety disorder, borderline intellectual functioning, ADHD, mood disorder, and obstructive sleep apnea.  (*Id.*)

After determining Gullas' impairments did not meet or equal the requirements of a Listing at any point in time, the ALJ proceeded, at step four, to consider the evidence for the period prior to Gullas' DLI of December 31, 2014.  (Tr. 18-23.)  Of particular relevance, the ALJ discussed Gullas' allegations of a learning disability, anxiety, and ADHD.  (Tr. 18.)  The ALJ reviewed Gullas' educational records, acknowledging Gullas' need for special education, his ninth grade educational level, his academic and social problems in school, and an overall ability in "the slow learning range."  (Tr. 19.)  The ALJ discussed the 2014 treatment notes with Dr. Ayers, noting Gullas had requested a referral to a psychiatrist for depression in November 2014, but denied any confusion.  (*Id.*)  The ALJ commented on the fact Dr. Ayers observed Gullas "wanted to start the process to apply for disability for psychiatric reasons but had never seen a psychiatrist."  (Tr. 19.)  The ALJ noted Gullas' testimony regarding his work history, noting Gullas had reportedly been fired for "concentration problems" and had been unable to "get a job because of his lack of education."  (Tr. 21.)  The ALJ provided a detailed discussion of Gullas' reported activities of daily living and the opinion evidence contained in the record, including the state agency physicians' conclusion there was insufficient evidence for Gullas' Title II claim. (Tr. 19-23.)

The ALJ formulated the following RFC for the period prior[10] to March 17, 2015:

> After careful consideration of the entire record, the undersigned finds that prior to March 17, 2015, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except that the claimant could never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle.  The claimant had difficulty reading normal print but retained sufficient visual acuity to read large print, work with large objects, and avoid workplace hazards.  The claimant was able to understand, remember, and carry out simple, routine tasks.  The claimant could frequently interact with supervisors, coworkers, and the public.

(Tr. 18.)

The Court finds the ALJ's RFC for this period is supported by substantial evidence.  As discussed *supra*, the evidence prior to Gullas' DLI is minimal.  Educational records establish Gullas had both social and academic problems as a child and required special education support. (Tr. 365, 375, 378, 379, 376.)  In the fourth grade, Gullas was working at a second to third grade level.  (Tr. 359.)  His report cards from grade seven and eight revealed grades in the C and D range.  (Tr. 376.)  When Gullas was in the ninth grade, he underwent a psychological evaluation due to his issues at school.  (Tr. 370.)  Gullas' teachers reported Gullas gave up easily, failed to turn in work, and struggled to sustain attention.  (*Id*.)  However, Gullas also enjoyed working on car engines and was currently working an after school landscaping job.  (Tr. 371.)  His intelligence testing during the evaluation revealed his overall ability fell within the "slow learning range."  (*Id*.)  His non-verbal abilities were in the average range and he had strong psychomotor and visual skills.  (*Id*.)  Academic testing indicated Gullas could read at the 8.5

---

[10]    Gullas does not challenge the ALJ's RFC assessment for the period after March 17, 2015.  Therefore, the Court will limit its analysis to the first RFC assessment contained in the decision.

grade level, spell at the 5.2 grade level, and had "not mastered the basic number facts" in mathematics.  (*Id*.)   There was no diagnosis offered during this evaluation.  The ALJ discussed these educational records, accounting for them in the RFC by limiting Gullas to simple, routine work with only frequent interactions with others.  (Tr. 18-19).

The remainder of the evidence prior to the December 31, 2014 DLI is two visits with Dr. Ayers and a sleep study.  (Tr. 528, 550, 522.)  During these office visits, Gullas reported depression and was obese.  (*Id*.)  The ALJ reflected this in the decision, finding Gullas had the severe impairments of morbid obesity, sleep apnea, and major depressive disorder during this time period.  (Tr. 15.)  The ALJ accounted for these impairments by limiting Gullas to a medium RFC with several environmental and mental restrictions.  (Tr. 18.)  The findings made by the state agency physicians further support the ALJ's RFC assessment.  Both Dr. Haskins and Dr. Hoyle determined there was insufficient evidence to make a determination of disability on Gullas' Title II claim.  (Tr. 118, 154.)

While Gullas argues the mental RFC for this period is "not based on substantial evidence," he does not offer any specific limitations the ALJ should have assessed in this RFC. (Doc. No. 12 at 19-20.)  Gullas cites to his educational records and the psychological evaluation he underwent in the ninth grade, which he believes supports a finding of disability prior to the SSI application date.  (Doc. No. 12 at 15-16.)  He also references an August 2015 consultative examination and February 2015 mental health treatment notes, both of which occurred months after the DLI.  (*Id*. at 16-17.)  However, he does not explain how these educational records and remote psychological evaluation are inconsistent with the RFC assessed by the ALJ, or what limitations should have been included due to this medical evidence.  Moreover, the findings of

the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003). In this case, the ALJ clearly articulated her reasons for finding Gullas capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence. Accordingly, Gullas' vague assertion these educational records warrant a different RFC assessment is without merit.

In addition, Gullas argues remand is required because the record does not support a finding the limitations from his borderline intellectual functioning and anxiety "only began" on March 17, 2015. (Doc. No. 12 at 20.) As discussed *supra*, this is a misunderstanding of the ALJ's decision. The ALJ did not affirmatively find Gullas did not suffer from borderline intellectual functioning and anxiety prior to the SSI application date. Rather, the ALJ agreed there was "insufficient evidence" to establish disability prior to Gullas' DLI. (Tr. 19.) A review of the record indicates no diagnosis of borderline intellectual functioning or anxiety prior to the DLI. Moreover, the ALJ accounted for Gullas' intellectual and social deficits in the RFC, by limiting him to simple, routine tasks and frequent interaction with others. (Tr. 18.) While the RFC following the SSI application date is more restrictive, it coincides with Gullas' increase in mental health symptoms and regular mental health treatment. (Tr. 24-26.)

Accordingly, and for all the reasons set forth above, Gullas' second assignment of error is without merit and does not provide a basis for remand.

C.      **Sentence Six Remand**

In his final assignment of error, Gullas argues this matter should be remanded for further administrative proceedings pursuant to Sentence Six of 42 USC §405(g) because he provided new and material evidence to the Appeals Council.  (Doc. No. 12 at 20-21.)  This evidence includes a neurocognitive assessment report dated December 17, 2017.  (*Id.* at 20.)  He asserts this evidence was new, as the neurocognitive assessment did not occur until after the ALJ issued her decision.  (*Id.* at 21.)  Gullas argues this report is also "material" because "it directly addresses [his] level of intellectual functioning and ties the condition to a period prior to March 17, 2015.  (*Id.*)  Further, Gullas asserts he had "good cause" for not submitting this report to the ALJ prior to her decision because he "could not have know that the ALJ was going to find that the borderline intellectual functioning only started on March 17, 2015" as "borderline intellectual functioning is not a medical impairment that simply develops as an adult and the school records document [his] intellectual limitations."  (*Id.* at 22.)

The Commissioner maintains remand is not warranted under Sentence Six because the neurocognitive report "would not change the ALJ's decision because the report did not conclusively establish [Gullas] had any medically determinable mental impairment prior to December 31, 2014," i.e., the DLI.  (Doc. No. 14 at 14-15.)  The Commissioner further argues Gullas "has not demonstrated good cause for why he was unable to undergo and submit a neurocognitive assessment before the ALJ issued [the] decision," noting Gullas has "ample opportunity to undergo testing during the 38-year period between his alleged onset date and 2014."  (*Id* at 13-14.)

The Sixth Circuit has repeatedly held "evidence submitted to the Appeals Council after

the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g). *Id*. *See also Cline v. Comm'r of Soc. Sec*., 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec*., 529 Fed. App'x 706, 717 (6th Cir. July 9, 2013) (stating that "we view newly submitted evidence only to determine whether it meets the requirements for sentence-six remand"). Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g) (emphasis added).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' " *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626). Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id*. (quoting *Sizemore v. Sec'y of Health & Human Servs*., 865 F.2d 709, 711 (6th Cir.1988)). *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007) (noting that evidence is "material" if it "would likely change the Commissioner's

decision."); *Courter v. Comm'r of Soc. Sec.*, 2012 WL 1592750 at * 11 (6th Cir. May 7, 2012) (same). Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the administrative hearing. *See Prater v. Comm'r of Soc. Sec.*,---- F. Supp.3d ----, 2017 WL 588496 at * 2 (N.D. Ohio Feb. 14, 2017). *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir.2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec.*, 2013 WL 5613751 at * 3 (6th Cir. Oct.15, 2013) (same).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster,* 279 F.3d at 357. *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter,* 2012 WL 1592750 at * 11. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)). This includes "detailing the obstacles that prevented the admission of the evidence." *Courter,* 2012 WL 1592750 at * 11. *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant. *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand [s] for further fact-finding." *Courter*, 2012 WL 1592750 at * 11.

40

*See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).  Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993).  *See also Melkonyan*, 501 U .S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

Gullas argues a sentence six remand is appropriate based upon a December 17, 2017 psychological assessment report.  (Tr. 44-57.)  In October and November 2017, Gullas underwent extensive testing "for a psychological assessment of his cognitive functioning and ability to live independently."  (Tr. 44.)  He was examined by Silvia Rodriguez, B.S., a clinical psychological trainee.  (Tr. 44, 54.)  Psychologist Joseph Steiner, Ph.D., also signed the December 2017 report.  (Tr. 54.)  During the evaluation, Gullas described difficulty living independently, holding a job, and succeeding in school.  (Tr. 44.)  He described depression and suicidal ideation.  (Tr. 45.)  However, he was alert, attentive, and friendly during testing.  (Tr. 46.)

During the evaluation, Gullas underwent a battery of tests over a course of four days. (*Id.*)  Testing indicated severe anxiety, suicidal ideation, and "mild cognitive impairment primarily in long-term memory and higher order thinking."  (Tr. 47.)  Gullas obtained a full scale IQ of 69, placing him in the extremely low range.  (Tr. 48.)  However, "due to the significant variability between index scores" this full scale IQ score was "not considered a valid measure of Mr. Gullas' general cognitive functioning."  (*Id.*)  His verbal comprehension index score was 72, placing him in the borderline range, his perceptual reasoning index score was 81, placing him in the low average range, his working memory index was 77, placing him in the borderline range,

and his processing speed index score was 62, placing him in the extremely low range.  (Tr. 48-49.)  Based upon this testing, the examiner concluded Gullas "intellectual functioning [was] extremely low for his age."  (Tr. 49.)

Gullas also displayed "reasonably good use of space and logical organization" and academic abilities in the "low average and average range."  (Tr. 50.)  The examiner noted these scores "provide additional support that Mr. Gullas has a moderate intellectual disability."  (*Id.*)  Gullas demonstrated a "relative strength in communication," but a "relative weakness in socialization."  (Tr. 52.)  The examiner concluded Gullas' "inability to live independently appears to be a lifelong condition."  (*Id.*)  The examiner observed the scores obtained during testing provided "additional evidence that his low intellectual and academic functioning has been present since he was a child."  (Tr. 53.)  Ms. Rodriguez and Dr. Steiner recommended personality testing, a consult with a nutritionist, and a caregiver.  (Tr. 54.)

The Court finds Gullas has not demonstrated a sentence six remand is warranted.  This assessment and accompanying report are "new," as they post-date both the administrative hearing and the ALJ decision.  *See Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 734 (N.D. Ohio June 14, 2005).  However, Gullas must also demonstrate the materiality of this December 2017 report.  Gullas materiality argument centers the IQ scores contained in the report, as well as the conclusion "his low intellectual and academic functioning has been present since he was a child."  (Doc. No. 12 at 22.)  He asserts this report "indicates Mr Gullas' mental impairment predated March 17, 2015 and that the ALJ reasonably could conclude that Mr. Gullas' disability predated March 17, 2015."  (Doc. No. 12 at 22.)

As an initial matter, Gullas misstates the standard for establishing materiality for

purposes of a sentence six remand.  The inquiry is not whether the "ALJ reasonably could conclude" Gullas' disability began prior to March 17, 2015.  Rather, the inquiry is whether this opinion would have created a "reasonable probability that the ALJ would have rendered a different decision." *Cross*, 373 F.Supp.2d, 734.  The Court finds it would not.  Gullas' IQ testing and psychological assessment occurred in October and November 2017, and the report was dated December 17, 2017.  (Tr. 44.)  This is nearly three years after Gullas' DLI of December 31, 2014.  The Court finds it unlikely an ALJ would conclude Gullas established disability prior to his DLI by presenting a report dated *three years* after Gullas' eligibility for Title II benefits expired.

Gullas argues this testing establishes Gullas had these same limitations and deficits since childhood, as the report concludes Gullas had "low intellectual and academic functioning . . . since he was a child."  (Tr. 53.)  However, the ALJ did not disregard[11] Gullas' educational records and reports of academic and social deficits in childhood.  Indeed, the ALJ specifically discussed Gullas' need for special education and accounted for such in the RFC, limiting him to simple, routine tasks with frequent social interaction.  (Tr. 18.)

Assuming, *arguendo*, this December 2017 report is "material," Gullas has not met the burden of establishing "good cause."  In order to establish good cause, "a claimant must give a valid reason for his failure to obtain evidence prior to the date of the hearing." *Cross*, 373 F.Supp.2d at 734.  Gullas' main explanation for his failure to obtain this report earlier is that he

---

[11]     The Court acknowledges the ALJ did not list borderline intellectual functioning as a severe impairment prior to March 17, 2015.  (Tr. 15.)  However, Gullas did not raise any assignment of error regarding the ALJ's determination of severe impairments. Moreover, the ALJ accounted for any intellectual deficits his educational records established in the RFC.  (Tr. 18.)

43

"could not have anticipated" the ALJ make a finding "contrary to the accepted beliefs about intellectual functioning."  (Doc. No. 15 at 8, Doc. No.12 at 23.)  The Sixth Circuit has rejected such an argument, reasoning as follows:

> Presumably, Claimant is arguing that she could not anticipate that the ALJ would find that she did not qualify as mentally disabled and therefore that she would need to bolster her case with additional evidence.  Claimant's argument is frivolous and fails to provide a reasoned explanation for or detail the obstacles that hindered her from seeking the evaluations sooner.  *See Bass*, 499 F.3d at 513; *Oliver*, 804 F.2d at 966.  A party should always anticipate that a decision maker might rule against it.  A belief that one would not "lose" given the evidence admitted cannot meet the "good cause" standard for failing to obtain or submit all useful evidence in the first instance.  Because Claimant cannot show good cause for her failure to obtain the opinions of Dr. Hartmann and Ms. Moore prior to the ALJ's decision, Claimant is not entitled to remand under sentence six of § 405(g).

*Courter v. Comm'r of Soc. Sec*., 479 Fed App'x 713, 725-726 (6th Cir. May 7, 2012).

Gullas also attempts to argue, by citing to several cases from other Circuits, that his full scale IQ score of 69[12] creates "a rebuttable presumption of a fairly constant IQ score throughout a claimant's life."  (Doc. No. 12 at 22-23, Doc. No. 15 at 8.)  However, this does not establish good cause.  Gullas had ample opportunity to obtain IQ scores and intellectual testing prior to the ALJ hearing, but failed to do so.  Indeed, Gullas had specifically told Dr. Ayers he was seeking disability based upon his mental and psychological deficits, and had no qualms about requesting referrals to various other specialists.  (Tr. 529, 522, 518.)  *See Caplinger v. Colvin*, 2014 WL 4908954, *5 (S.D. Ohio Sept. 30, 2014)("Plaintiff has failed to show good cause for not obtaining the IQ test results earlier.  First, at the conclusion of the hearing, Plaintiff and his

---

[12]    Moreover, the Court notes the examiner during the December 2017 testing concluded "due to the significant variability between index scores" this full scale IQ score was "not considered a valid measure of Mr. Gullas' general cognitive functioning."  (Tr. 48.)

counsel failed to request the ALJ to leave the record open so he could present additional evidence.").  *See also Winters v. Comm'r of Soc. Sec.*, 215 F.3d 1328 (Table), 2000 WL 712353, *2 (6th Cir. 2000)(denying a sentence six remand for IQ scores obtained after the ALJ hearing, reasoning the claimant had "ample opportunity to obtain probative evidence of a purported mental impairment prior to the ALJ hearing, but did not do so.").

In sum, the Court finds Gullas has failed to carry his burden of demonstrating a sentence six remand is warranted.  Accordingly, and for all the reasons set forth above, Gullas' third assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: February 5, 2019

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**